Filed 10/8/21  In re A.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re A.W., a Person Coming Under the Juvenile Court Law. | |
| | D078959 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. NJ15670) |
| Plaintiff and Respondent, | |
| v. | |
| A.R., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

A.R. (Mother) appeals jurisdictional and dispositional orders removing her nine-year-old son, A.W., from her custody pursuant to Welfare and Institutions Code[1] section 361, subdivision (c)(1). The San Diego County Health and Human Services Agency (Agency) initiated the juvenile dependency proceedings based on A.W.'s exposure to domestic violence between Mother and her husband. After Mother failed to follow through on a mutually agreed safety plan, the Agency petitioned to remove A.W. from Mother's custody under section 300, subdivision (b)(1). The juvenile court held a contested jurisdictional and dispositional hearing over four days, found the allegations of the petition true, removed A.W. from Mother's custody, and concluded there were no reasonable means to prevent A.W.'s removal.

Mother challenges the juvenile court's jurisdictional and dispositional findings in this appeal. She contends substantial evidence does not support the jurisdictional findings because there was no risk of harm to A.W. at the time of the contested adjudication. She also challenges the dispositional findings removing A.W. from her custody and determining that no reasonable alternatives existed to ensure his safety absent removal. Finally, she claims the court violated her rights to due process by refusing her request to remove a social worker from her case. We reject each of these contentions and affirm the orders.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

1.  *Events Leading to A.W.'s Dependency Proceedings*

A.W. is Mother's only child. When Mother was 27 years old, she met A.W.'s father, J.W. (Father).[3] The couple separated shortly after A.W. was born, and Mother was awarded primary physical custody during family court proceedings. According to Father, Mother has an Adderall addiction and a history of drug abuse. Father reported Mother stopped using Adderall during the pregnancy, but she began using drugs again after A.W. was born.

Mother began dating A.W.'s stepfather, J.B. (Stepfather), when A.W. was three years old. Six months into the relationship, after the couple had been drinking, Mother threw a steak at Stepfather, and he pulled her hair and bent her finger back. The couple nonetheless married three years after this incident in 2017.

In August 2020, the Agency received a referral regarding a domestic violence incident between Mother and Stepfather that took place on August 11. According to the police report, Stepfather punched Mother on her forearm, and kicked her twice in the buttocks and vaginal area. Mother sustained several visible bruises from the altercation. Stepfather also threatened to kill Mother during the incident and attempted to prevent her from calling the police. Mother was eventually able to flee from the home with A.W., and they began living with the maternal aunt, M.R.

Mother told the investigating officer she and Stepfather had a long history of domestic violence, and only some of the incidents were reported to

---

[2]  "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

[3]  Father is not a party to this appeal.

law enforcement. The investigating officer provided Mother a domestic violence pamphlet and confirmed she understood how to obtain a temporary restraining order against Stepfather.

Another maternal aunt, M.F., told the investigating social worker that the domestic violence between Mother and Stepfather was ongoing. She described occasions when Mother would arrive to family events with bruises and would make excuses when questioned. Mother later began isolating herself and A.W. from the maternal family. M.F. was concerned for Mother's and A.W.'s safety if they returned to the home.

When the social worker met with Mother in person on August 13, 2020, she reported three incidents of domestic violence with Stepfather between June and August 2020. Mother claimed A.W. did not witness these incidents, either because he was not present in the home or was in his bedroom. She denied having any injuries aside from bruises on her knees and forearms, although the social worker also observed bruises on her chin and wrist. Mother refused to allow the social worker to interview A.W.

The social worker created a safety plan for A.W. in which Mother agreed to cut off physical contact with Stepfather, leave A.W. with a trusted person while she collected her belongings from the home, and obtain a restraining order against Stepfather by August 14. Mother violated the safety plan almost immediately by failing to obtain a restraining order. When the social worker asked about this, Mother explained she had hired a private investigator[4] to investigate Stepfather, and the investigator advised her against getting a restraining order.

---

[4] Mother referred to this private investigator as a "CIA agent," although the Agency confirmed the CIA was never involved.

A few weeks later, the social worker and law enforcement officers responded to a report that Stepfather had firearms in the home. When the social worker arrived at the home, Mother and A.W. were there collecting Mother's belongings. Mother denied seeing Stepfather and claimed he was not home. After the social worker told Mother she was in violation of the safety plan by bringing A.W. with her to the home, Mother became defensive and walked away. The social worker interviewed A.W. later that day, and he reported Stepfather was home when he and Mother arrived.

The social worker created a new safety plan, designating the maternal aunt, M.R., and the maternal grandfather as A.W.'s primary caretakers, and Mother was allowed supervised visits. Mother agreed to the plan for one week, and it was set to expire on September 21, 2020.

2.    *A.W.'s Dependency Proceedings*

On September 16, the Agency filed a petition under section 300, subdivision (b)(1), alleging there was a substantial risk then eight-year-old A.W. would suffer serious physical harm or illness based on Mother's failure to adequately supervise him by exposing him to violent altercations. According to the petition, Mother minimized the frequency and severity of the domestic violence, and the Agency's efforts to safety plan and offer voluntary services were unsuccessful.

At the detention hearing[5] on September 18, the court found a prima facie showing that A.W. was described by section 300, subdivision (b)(1), and ordered A.W. detained in the home of the maternal aunt, M.R. Through counsel, Mother submitted to A.W.'s placement with M.R., explaining the arrangement would be in A.W.'s "best interest for the time being . . . ."

---

[5]    All juvenile court proceedings in this case were conducted virtually via videoconference or telephone due to COVID-19 emergency measures.

After the detention hearing, a new social worker was assigned to the case. Mother told the new social worker that before May 2020, her relationship with Stepfather was "good." She attributed the fights between them to her Adderall use and her health problems caused by a leaking breast implant. She denied Stepfather ever hit her and claimed she had bruises because she was anemic. In Mother's view, A.W. had only seen one incident between her and Stepfather, and he "did not witness anything worthy of getting taken away." She also indicated there were three instances where A.W. heard her and Stepfather arguing. She felt Stepfather was a source of "stability" for A.W. and she was worried about Stepfather no longer being involved in her son's life.

Mother reported that she regretted calling the police in August 2020 and claimed the police report contained inaccurate information. She accused the investigating officer of being a "sexist pig" who did not take her seriously. Mother complained the Agency's detention report also contained inaccuracies and made her feel disrespected. "I felt," she said, "like [the prior social worker] didn't like me since day one. She seemed cold and not nice to me." Mother further indicated that her family was trying to break up her marriage because of a vendetta against Stepfather. She claimed her sister, M.F., fabricated allegations about Stepfather and that she and M.F. "hate each other."

Although Mother told the social worker she planned to move out of the home she shared with Stepfather, she also stated they could not afford to live separately and that she wanted her marriage to work. The social worker referred Mother to group therapy classes for domestic violence.

In the jurisdiction and detention report dated October 23, 2020, the Agency recommended the court find the petition true, remove custody from

Mother, and order reunification services. Mother requested a trial on jurisdiction and disposition, and trial was originally set for January 5, 2021.

The case was transferred to a different social worker (Williams) in December 2020. Williams authorized Mother's therapist to supervise a holiday visit between A.W. and Mother at Mother's home. Although Williams told Mother's therapist that Stepfather was not allowed to attend, Stepfather was present for the visit.

Two days before the scheduled trial, on January 3, Mother and M.R. had a violent altercation in A.W.'s presence. Earlier that day, Mother called M.R. upset about the upcoming trial because A.W.'s lawyer had opposed returning A.W. to Mother's custody. M.R. found A.W. crying later that afternoon. According to M.R.'s husband, Mother called A.W. and asked if he would rather live with her and Stepfather or with M.R. and her family, and then began yelling and taunting him. M.R. sent a text message to Mother stating that she was not allowed at the home that day for a visit.

Mother nonetheless arrived at the home about fifteen minutes later, resulting in an altercation with M.R. According to M.R., Mother appeared to be under the influence of alcohol and attempted to push her way into the home. M.R. believed her finger had been broken during the confrontation. She called 911 and gave a statement to an officer over the phone. M.R.'s husband and eight-year-old daughter witnessed the incident and confirmed M.R.'s version of events.

Social worker Williams prepared an addendum report for the January 5 trial date, which included details about the altercation that occurred between Mother and M.R. on January 3. At the scheduled hearing on January 5, Mother's counsel requested and received a continuance given the recent developments in the case.

A few days later, Williams spoke with A.W. about the incident on January 3. A.W. confirmed he had a phone conversation with Mother that day that made him cry. He told Williams, "[Mother] was saying stuff like, do you want to live with your aunt, fine, then go ahead, live with your aunt, go ahead, fine then." He indicated Mother arrived at the house later that day even though M.R. had told her not to. A.W. hid in the kitchen while Mother and M.R. argued, but he could still hear them. He reported feeling upset and crying during the argument.

A.W. also reported overhearing arguments between Mother and Stepfather in the past, "a couple of times, like two or three or four." He said he was usually in his bedroom when they fought, but he also saw them "arguing really loud" sometimes. He reported seeing broken glass and hearing things being thrown around the house. He described the arguments as "kind of scary."

Williams also discussed the January 3 incident with Mother. Mother explained she and M.R. had "personal issues" for years, and their relationship had recently gotten worse. She claimed she and M.R. did not have an argument earlier in the day on January 3, and she was "completely blindsided by [M.R.'s] attack . . . ." Mother stated that she "walked into [M.R.'s] home and was immediately met with anger and choking." Mother reported having a lump on her forehead, deep scratch marks, and bruises from the altercation. Pending an evidentiary hearing, Mother obtained a temporary restraining order (TRO) against M.R. following the incident.[6]

Williams and Mother had a phone conversation on January 8. Although Williams believed the conversation had ended, apparently Mother

_____

[6] The hearing on Mother's restraining order request, originally set for January 21, was rescheduled to April 23. There is no indication in the record that a permanent restraining order was ever issued.

was still on the call. Mother then overheard a conversation between Williams, M.R., and M.R.'s husband regarding juvenile dependency proceedings and the process for obtaining a TRO. After overhearing this, Mother accused Williams of coaching her sister on how to "win the trial."

By January 10, 2021, Mother's relationship with social worker Williams had soured completely. During a supervised phone call, Williams had to redirect Mother several times after she told A.W. he would be "home soon," and that she and Stepfather were "going to fight to have him come home." These comments were made despite Williams's warning that Mother should avoid discussing the dependency proceedings, reunification, or Stepfather during her communications with A.W. Williams also refused to give A.W. a letter Mother had written discussing these topics. Mother responded by accusing Williams in an e-mail of being abusive, a bully, dishonest, unethical, brainwashing A.W., and attempting to profit off him. Mother then began refusing visitation with A.W. because she did not want Williams to be present.

In February, Mother filed a motion to remove social worker Williams from A.W.'s case or, in the alternative, to strike all reports authored by Williams. She argued Williams was biased by disregarding evidence favorable to Mother, presenting adverse evidence from noncredible sources, and willfully and intentionally violating court orders. Mother offered her own declaration in support of the motion.

In preparing for the jurisdiction and disposition hearing, Mother told Williams she had documents and certificates she wanted included in the addendum report. Williams explained she would need the documents at least four days before the hearing to review and verify them for inclusion. Mother

9

did not submit any documents by the deadline, and the documents were not discussed in or attached to Williams's final addendum report.

The contested adjudication hearing was held over four days in April 2021. The Agency submitted reports documenting events in the dependency proceedings and the curriculum vitae of Williams. Mother submitted the 19 documents she had wanted Williams to include in her addendum report. These included certificates of completion for domestic violence and parenting classes; an undated letter from Mother's therapist; a psychiatric diagnostic evaluation dated March 10, 2021; and a non-random drug test result from March 9, 2021.[7]

At the trial, the juvenile court heard testimony from Mother, the social worker assigned to the case from October 2020 to December 2020, and social worker Williams. Mother testified she had complained to the ombudsman and Williams's supervisor about Williams's conduct, and that Williams retaliated against her for making these reports. She faulted Williams for failing to provide the court with her exhibits, although she admitted she had not submitted the documents by the deadline Williams gave her.

Regarding her relationship with Stepfather, Mother admitted Stepfather had stayed with her over the holidays, but testified that now they were no longer living together. She indicated she was now willing to get a restraining order against him and intended to divorce him when she was financially able to do so. Mother maintained she had completed various online courses and other one-on-one services for domestic violence and parenting, which she felt helped her gain insight and realize she had minimized the domestic abuse. She also participated in group therapy

---

[7] The Agency asked Mother to submit to a random drug test on January 13, 2021, but Mother refused.

10

sessions but quit after receiving feedback that she was still minimizing and other critiques she believed were inaccurate. She then began group therapy at another location and had completed seven group therapy sessions in total by the hearing date.

In her testimony, social worker Williams stated she was unaware Mother had complained about her to her supervisor or the ombudsman. Williams explained that when Mother overheard her phone call with A.W.'s caretakers, she was only describing the differences between criminal and juvenile dependency courts, and then thanked the caretakers for their cooperation. Williams acknowledged she had not attached Mother's exhibits to her most recent addendum report, but claimed she did not have sufficient time to verify the exhibits given her caseload and the work required to assess the new evidence. She indicated she had reviewed the exhibits in preparation for the hearing, and the exhibits did not change her recommendation that the court should assume jurisdiction and remove custody.

3.    *The Juvenile Court's Rulings*

The juvenile court first denied Mother's motion to remove social worker Williams. It rejected the implication that Williams was coaching A.W.'s caretaker during the phone call Mother overheard in light of Williams's testimony that she was simply answering the caretaker's questions. As to the omitted exhibits, the court found Williams's failure to present this evidence was at most inadvertent, and there was no evidence she intentionally withheld the information. It noted the communications between Williams and Mother did not contain any expletives or pejoratives, and the situation amounted to a disagreement between the two. The court

11

concluded that Williams's removal from the case was unwarranted as the record did not a support any finding of bias.

Regarding jurisdiction, the juvenile court found the petition true by clear and convincing evidence.[8] It noted there were incidents of domestic violence between Mother and Stepfather prior to the dispute in August 2020 that led to the dependency proceedings. The court concluded that A.W. was confused and traumatized by these domestic violence disputes. It also questioned Mother's reasoning for not getting a restraining order following the August 2020 incident, since her injuries and A.W.'s presence in the home during the altercation "created a real protective issue." Although Mother's testimony represented she was ready to end her relationship with Stepfather, her communications with A.W. suggested she was intending to reunite the family.

The juvenile court also referenced the confrontation in January 2021 between Mother and her sister, M.R. Although the record was unclear as to who was the primary aggressor, the court found Mother was a catalyst for the dispute and that she minimized her role in it. Given A.W.'s prior exposure to domestic violence, the court believed he was re-traumatized by the January 3 dispute between Mother and M.R., and that Mother failed to demonstrate insight into the trauma caused by A.W.'s exposure to these domestic violence incidents.

The juvenile court addressed Mother's participation in treatment and classes for domestic violence. It credited her for continuing with individual therapy and for completing an online program. The court found, however, that the one-on-one nature of these services "did not appear to be successful."

_____

8    Although the juvenile court made the jurisdictional findings by clear and convincing evidence, only a preponderance of the evidence was required. (§§ 300, 355, subd. (a).)

Although Mother had participated in group therapy, she stopped after receiving critical feedback and elected to start a new program. The court noted that Mother had only attended six or seven domestic violence treatment sessions in six or seven months. The court concluded that given the evidence in the record showing Mother had minimized A.W.'s trauma, he was at risk until Mother made further progress in her treatment.

The juvenile court then removed custody from Mother and ordered reunification services. It indicated it had carefully considered whether there were reasonable means to avoid removal, but expressed concerns regarding Mother's conduct at the beginning of the case when she violated the voluntary safety plan, as well as the impact of her conduct on A.W. Mother's behavior during the case indicated she was struggling with avoidance and reactivity, and she still needed to demonstrate substantial insight into the effects of domestic violence. The court concluded that short of removal, there were no other means available to adequately protect A.W.

DISCUSSION

Mother contends she presented clear and convincing evidence that A.W. was no longer at risk at the time of the contested adjudication hearing, and thus the juvenile court's jurisdictional and dispositional findings lack substantial evidence. We disagree and explain why the record contains ample evidence to support the court's findings. We also reject Mother's due process contentions regarding the need to replace social worker Williams, which we conclude lack support in the record.

1.      *General Legal Principles and Standard of Review*

Under section 300, subdivision (b)(1), a child comes within the juvenile court's jurisdiction if the Agency shows: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness

13

or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) A child's exposure to domestic violence is a well-established basis for a jurisdictional finding under section 300, subdivision (b)(1). (See *In re M.W.* (2015) 238 Cal.App.4th 1444, 1453 (*M.W.*); *In re R.C.* (2012) 210 Cal.App.4th 930, 941; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717.)

After jurisdiction is established, a dependent child may not be taken from the physical custody of the parent under section 361 at the dispositional stage unless the court finds there is clear and convincing evidence that there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and there are no reasonable means to protect the child's physical health without removing the child. (§ 361, subd. (c)(1).)

We review the juvenile court's jurisdictional and dispositional orders for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Under this standard, "we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53, disapproved on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614.)

2.    *Substantial Evidence Supports the Juvenile Court's
       Jurisdictional Findings*

In challenging the juvenile court's jurisdictional findings, Mother does not dispute that she exposed A.W. to domestic violence. Instead, she contends uncontradicted evidence shows she resolved the issues that led to the domestic violence and there was no present risk to A.W. at the time of trial.

To support the exercise of dependency jurisdiction under section 300, subdivision (b)(1), there must be evidence the domestic violence " 'is ongoing

14

or likely to continue.' " (*M.W.*, *supra*, 238 Cal.App.4th at p. 1453.)  The question, therefore, is whether circumstances at the time of the jurisdictional hearing posed a "defined risk" of future harm to the child.  (*In re T.V.* (2013) 217 Cal.App.4th 126, 134 (*T.V.*).)  A parent's " ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.)

Here there was ample evidence in the record to support the exercise of jurisdiction under section 300, subdivision (b)(1).  The evidence showed that the domestic violence quarrel between Mother and Stepfather in August 2020 was not an isolated incident.  A.W. reported hearing Mother and Stepfather argue multiple times, including an incident where he saw broken glass around the house and heard things being thrown.  Mother's sister, M.F., confirmed the domestic violence was ongoing and that Mother had shown up to family events with bruises.  Mother also told a police officer she and Stepfather had a long history of domestic violence.  Then, during the Agency's investigation, Mother initially admitted there had been several altercations between her and Stepfather, and she later confirmed a domestic violence incident occurred while she and Stepfather were still dating.

Mother contends there was no ongoing risk of harm at the time of trial because she had separated from Stepfather and was willing to get a restraining order against him.  According to a report from Mother's therapist, however, Mother and Stepfather only separated for a few months at the beginning of the dependency proceedings and began living together again over the holidays.  Indeed, Mother did not dispute that she allowed Stepfather to be present in the home during a holiday visit with A.W.

Mother also told A.W. she was preparing to reunite him with Stepfather.  In fact, she made statements throughout the case indicating that

15

rather than ending her relationship with Stepfather, she was working on improving it and that he was a good father figure to A.W. Although Mother testified at the adjudication hearing that she was prepared to seek a restraining order against Stepfather, the court was entitled to be skeptical. In the seven months between the time the petition was filed and the contested adjudication, Mother never sought a restraining order against him even though she had expressly agreed to do so under the Agency's initial safety plan. Until it saw sufficient action to match expressed intent, the court could reasonably discredit Mother's testimony that she was finally prepared to get a restraining order and end her abusive relationship with Stepfather.

Moreover, Mother's history of domestic violence was not confined solely to her relationship with Stepfather, since she had a violent confrontation with her sister as well. That clash occurred months after the dependency proceedings were initiated, and the violence was apparently severe enough that law enforcement was contacted and Mother obtained a TRO. Mother contends she should be credited for responding to this dispute "appropriately." But the evidence related to this incident indisputably shows she was involved in yet another exchange that further exposed her son to domestic violence. A.W. reported that he hid during the argument, and that the conflict between Mother and M.R. made him cry. Mother's involvement in several domestic violence incidents in A.W.'s presence that involved different individuals suggests a pattern of interpersonal behavior that would justify a continuing concern for A.W.'s emotional and physical safety.

Mother's minimization of the domestic violence and reluctance to take responsibility further supported a finding of an ongoing risk. She told the social worker initially assigned to the case that she only had bruises on her

16

knees and forearms from the August 2020 incident, even though the social worker could see bruising on her chin and wrist. She later claimed Stepfather never hit her, and she had bruises because she was anemic.

Of particular concern, Mother expressly minimized the harm that the domestic violence in her relationship with Stepfather caused A.W., claiming he "did not witness anything worthy of getting taken away." She likewise attempted to deflect blame for the altercation with her sister, even though four other individuals—including her son—contradicted her. Then, when she received feedback during group therapy that she was minimizing, she quit the program. Based on Mother's persistent minimization and denial of responsibility, substantial evidence supported the juvenile court's finding that A.W.'s exposure to abuse was likely to recur. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."].)

Overall, Mother's assertion that she resolved the issues that led to the past domestic violence asks this court to reweigh the evidence, something we cannot do. Although Mother presented some evidence suggesting she had developed insight into the effects of the domestic violence, there is also substantial evidence to support the juvenile court's finding that domestic violence of one form or another in A.W.'s presence was likely to recur. We therefore conclude the record contains sufficient evidence to support the court's jurisdictional findings under section 300, subdivision (b)(1).

3. *Substantial Evidence Supports the Juvenile Court's Dispositional Findings*

Mother's arguments regarding the juvenile court's dispositional findings are similar to the arguments she raises regarding the jurisdictional findings. She contends the domestic violence was no longer a substantial risk

17

to A.W. because she had developed insight by attending classes and therapy, and because she and Stepfather have ended their relationship.

A child may be removed from the parent's custody at the dispositional stage where " 'return of the child would create a substantial risk of detriment to the child's physical or emotional well-being.' " (*In re H.E.* (2008) 169 Cal.App.4th 710, 720.) "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) A child does not have to be "actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*T.V.*, *supra*, 217 Cal.App.4th at pp. 135–136.)

The record supports the juvenile court's conclusion that A.W. faced a substantial risk of harm if returned to his mother's custody. As we have discussed, evidence in the record indicated Mother and Stepfather would likely continue their abusive relationship, and Mother's testimony that she would obtain and enforce a restraining order against Stepfather was not credible. Mother emphasizes that the last domestic violence incident between her and Stepfather occurred in August 2020, but in doing so she overlooks the significance of the altercation she had with her sister in January 2021. Her attempts to downplay her involvement in the January dispute demonstrated that she had not developed meaningful insight and was still minimizing the risks that domestic violence posed to A.W. She also cites her participation in therapy and domestic violence classes as evidence that A.W. was no longer at risk. Although therapy and domestic violence classes were a step in the right direction, the juvenile court could reasonably

18

conclude that Mother still needed to progress in her treatment before A.W. could safely return to her care.

Mother also contends the evidence was insufficient to support a finding that there were no reasonable means to protect A.W. without removal from her custody. She contends that the monitoring of her home through her personal security system, unannounced visits from social workers, and in-home services were viable alternatives to removal.

Substantial evidence in the record indicates that alternatives to removal dependent on Mother's cooperation were not an adequate means of protecting A.W. Throughout this case, Mother was uncooperative and demonstrated an unwillingness to work with the Agency. She was initially provided the option of a safety plan following the domestic violence incident with Stepfather in August 2020, which she violated by failing to obtain a restraining order and by bringing A.W. with her to the family home when Stepfather was present. Her disregard of the safety plan created a significant risk that she would expose A.W. to further domestic abuse, and this led the Agency to file a petition to remove A.W. from her custody.

Then, rather than taking responsibility for the effects of her behavior on A.W., Mother claimed that the social worker who prepared the detention report was biased against her. She similarly accused social worker Williams of bias, and their relationship deteriorated to such a degree that she refused supervised visits with A.W. if Williams was present. She also failed to participate in the Agency's recommended group therapy sessions until February 2021, and then quit after receiving negative feedback. From this, the juvenile court reasonably concluded that an arrangement dependent on Mother's cooperation with the Agency would not adequately protect A.W.

19

For all these reasons, substantial evidence supports the juvenile court's conclusion that A.W.'s removal from Mother's custody was warranted.

4. *The Failure to Replace the Assigned Social Worker Did Not Violate Mother's Due Process Rights*

Mother contends the juvenile court violated her right to due process by refusing to remove social worker Williams from the case. She argues that Williams's failure to provide the court with a written recommendation regarding progress in counseling and other services denied her the right to a full and fair hearing. She further maintains that social worker Williams should have been removed from the case for bias.

In juvenile dependency proceedings, a parent has a due process right to notice of any hearing which might affect his or her parental rights. (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 412–413.) Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Mullane v. Cent. Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314.) The Due Process Clause also " 'entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.' " (*Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 673 (*Brown*).)

Social worker Williams testified at the trial to explain why she did not submit the 19 exhibits she received from Mother in an addendum report. Before submitting these documents in a written report, she would need to review each document, follow-up with the provider, and discuss the document with Mother to evaluate if she gained any insight from the program. She explained she did not have time to complete this process before the trial began due to her "incredible caseload." Although Williams could have asked the court for a continuance, she indicated it was not her practice to do so.

20

Williams's failure to provide this documentation in an addendum report does not amount to a violation of Mother's due process rights. In *In re Crystal J.*, *supra*, 12 Cal.App.4th at p. 412, this court addressed a situation in which the mother claimed deficiencies in the Agency's adoption assessment report constituted a violation of procedural due process. We acknowledged that "[w]here an investigative report is required prior to the making of a dependency decision, and it is *completely* omitted, due process may be implicated . . . . [¶] Where, however, the assessment report *is* prepared, *is* available to the parties in advance of the noticed hearing, and *does* address the principal questions at issue in the particular proceeding, errors or omissions in the report cannot be characterized in terms of denial of due process. [Citations.] Deficiencies in an assessment report surely go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights. Such deficiencies, however, will ordinarily not amount to a deprivation of procedural due process." (*Id.* at p. 413.)

Here, the issues before the juvenile court were whether A.W. was within the court's jurisdiction as a dependent child (§ 300, subd. (b)(1)), and whether he should remain in the custody of someone other than Mother (§ 361, subd. (c)(1)). While social worker Williams did not provide the court with a written recommendation regarding Mother's new exhibits, the Agency's reports that were submitted into evidence contained the facts underlying the Agency's recommendations for jurisdiction and disposition, including how the dependency proceedings were initiated and Mother's conduct throughout the case. Mother received these reports in advance and was given an opportunity to respond. Thus, "[t]his is not a case in which the parties' due process rights were violated because they did not receive the

21

report or no investigation was conducted." (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1380–1381.)

We further conclude that Williams's failure to provide these documents in a written report was not prejudicial.  Mother, through counsel, submitted her 19 exhibits into evidence.  Williams also testified about why her recommendation in the case was not changed by the new evidence.  Although Mother complains that Williams should not have been permitted to give this testimony, Mother had an opportunity to cross-examine her about the basis for her recommendation.  There is no indication that she was surprised by Williams's testimony at the hearing, nor has she explained why her ability to contest Williams's recommendation on cross-examination was unfairly prejudicial.  Indeed, the record shows counsel's questions thoroughly challenged Williams about the relevance of the new exhibits.  Thus, when the juvenile court made its findings, it possessed complete and accurate information about Mother's progress in her treatments and the grounds for the Agency's recommendation.  On this record, we conclude the outcome would likely have been the same even if Williams provided the court with the exhibits in a written report prior to the adjudication hearing.  (*In re Larry P.* (1998) 201 Cal.App.3d 888, 896.)

Mother's remaining contention that social worker Williams should have been removed for bias is also unpersuasive.  Section 16513.5 authorizes the removal of a social worker from dependency proceedings "if a preponderance of evidence shows that a conflict of interest has occurred that would interfere with the social worker's ability to objectively carry out his or her duties, which may include, but is not limited to, any of the following:  [¶]  (a) The social worker has had sexual contact, as defined in Section 43.93 of the Civil Code, with any party to the dependency proceedings.  [¶]  (b) The social

22

worker has a relationship with an individual who is adopting or attempting to adopt a child who is the subject of the pending dependency proceeding, and the relationship is of such a nature that a conflict of interest or bias may exist on the part of the social worker which may compromise his or her objectivity. [¶] (c) The social worker has been convicted of perjury with regard to the dependency proceeding before the court."

Mother does not contend that social worker Williams meets any of the enumerated examples under section 16513.5. She nevertheless contends that Williams should have been removed for bias because Mother overheard her "coaching" A.W.'s caretakers and refused to submit Mother's exhibits in an addendum report. According to Mother, Williams's conduct demonstrated she could not report fairly, honestly, and objectively in this case.

Deferring, as we must, to the juvenile court's factual findings, Mother has failed to demonstrate that Williams's conduct in this case was biased. As we have explained, Williams testified about why she did not have time to submit Mother's new exhibits in a written addendum report, and there is no evidence indicating that Williams purposefully withheld evidence that was favorable to Mother from the juvenile court. Additionally, while Mother's declaration presented one version of events regarding the phone call she overheard between Williams and A.W.'s caretakers, Williams provided a different account during her testimony. She explained that during this conversation she merely described the differences between criminal and juvenile dependency courts, and then thanked the caretakers for their cooperation. She never coached them on how to "win" the case, and the explanation she gave at the hearing was consistent with what she stated in her addendum report.

23

Moreover, the juvenile court reasonably discredited Mother's accusations against Williams in light of the fact that Williams was not the only individual Mother accused of bias during these proceedings. Mother also felt that the initial social worker assigned to her case treated her unfairly. She similarly complained that the police officer who responded to the domestic violence dispute in August 2020 was sexist and falsified information in his report. Later, she suggested that the counselor in her group therapy sessions had provided inaccurate information about her living arrangement with Stepfather and wrongly accused her of minimizing. Finally, she accused both of her sisters of fabricating allegations.

So rather than demonstrating that Williams had a conflict of interest, the record indicates that Mother tended to accuse her perceived adversaries of animosity and bias throughout these proceedings. At most, Mother has demonstrated that she and Williams disagreed about the appropriate recommendations and orders in this case, but that does not demonstrate bias warranting Williams's removal under section 16513.5 or amount to a due process violation. (Cf. *Brown*, *supra*, 224 Cal.App.4th at p. 673 [adverse legal rulings do not reflect personal bias].)

## DISPOSITION

The juvenile court's findings and orders are affirmed.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

GUERRERO, J.